DANIEL G. BOGDEN
United States Attorney
District of Nevada
PHILLIP N. SMITH, JR.
Assistant United States Attorney
Nevada State Bar No. 10233
501 Las Vegas Boulevard South
Suite 1100
Las Vegas, Nevada 89101
702-388-6336
phillip.smith@usdoj.gov

Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **2:16-CR-320-LRH-VCF** |
| | ) | |
| | ) | **GOVERNMENT'S RESPONSE TO** |
| Plaintiff, | ) | **DEFENDANT'S MOTION TO REVOKE** |
| | ) | **ORDER OF DETENTION AND GRANT** |
| v. | ) | **RELEASE** |
| | ) | |
| JACK BENJAMIN HESSIANI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The United States of America, by and through Daniel G. Bogden, United States Attorney, and Phillip N. Smith, Jr., Assistant United States Attorney, hereby responds in opposition to the "Motion to Revoke Order of Detention and Grant Release" ("Defendant's Motion") filed by Jack Benjamin Hessiani, by and through his counsel, Kathleen Bliss, Esq. The Defendant's Motion was filed and served on December 16, 2016 (*see* Docket #17). The Defendant's Motion requests that this Honorable Court, pursuant to 18 U.S.C. § 3145(a), revoke the detention order entered by United States Magistrate Judge Steven Kim of the Central District of California on November 16, 2016. For the reasons enumerated below, the Defendant's Motion should be denied.

## ARGUMENT

The District Court has the jurisdiction to review a Magistrate Judge's release order, and said review is to be conducted *de novo*; it must also be completed "promptly." *See, e.g.*, *United States v. Fernandez-Alfonso*, 813 F.2d 1571 (9th Cir. 1987) (delay of 30 days between defendant's motion for review of magistrate's pretrial detention order and district court hearing violated requirement under Bail Reform Act that district court determine motion "promptly," even though delay was inadvertent and not due to any fault of the parties). The Government submits that upon a *de novo* review by this Court, based on the facts and circumstances of this case, the Magistrate Judge's detention order should not be revoked because the Defendant poses a risk of danger to the community and a risk of nonappearance, neither of which can be sufficiently mitigated with any condition or a combination of conditions of release.

The Government respectfully submits that Magistrate Judge Kim did not err in finding that there was clear and convincing evidence that no conditions or combination of conditions will reasonably assure the safety of any other person and the community from the Defendant **and** that there was a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the Defendant as required. In considering the danger the Defendant poses to the community, 18 U.S.C. § 3142(g)(4) instructs that the Court should take into account "the nature and seriousness of the danger to *any* person *or* the community that would be posed by the [Defendant's] release." (Emphasis added.) The Government submits that the Defendant, based on his pattern of continued criminal, assaultive, and intimidating conduct, poses a danger to the community generally.

As an initial matter, the current charge of felon in possession of a firearm reflects an inherent risk of danger to the community and also a lack of respect for prior court orders, which prohibited the Defendant from possessing a firearm following his multiple felony convictions.

2

1   The Defendant is now facing criminal charges in two federal districts, including serious financial

2   fraud charges (unemployment benefits fraud resulting in more than $5 million in losses) in the

3   Central District of California ("CDCA") in *United States v. Hessiani et al.*, Case No. CR 15-499-

4   JAK.[1]   Although the Defendant had been on bond in the CDCA since September 2015, on

5   November 14, 2016, Pretrial Services in the CDCA submitted a petition to the Court requesting

6   an Order to Show Cause ("OSC") why the Defendant's bond should not be revoked.  *See* Exhibit

7   1.

8          In the letter in support of the requested OSC, the Pretrial Services Officer stated that the

9   "defendant [was] refusing to allow his location monitoring device to be refitted, in direct

10  violation of the program rules.  Given this conduct and the defendant's significant criminal

11  history involving threats and assaultive behavior, and his noncompliance with prior grants of

12  supervision, the defendant is an unsuitable candidate for bail."   As explained below, the

13  Defendant presents both a risk of nonappearance and a risk of danger to the community.  For

14  these reasons, the Government respectfully requests that this Court does not revoke the

15  Defendant's detention order.

16          **A.      Legal Standards.**

17          The Bail Reform Act of 1984 requires pretrial detention of a defendant where "no

18  condition or combination of conditions will reasonably assure the appearance of the person as

19  required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Courts

20  must consider several factors when determining whether there are conditions that could

21  reasonably assure the appearance of defendant and the safety of the community, including: (1)

22  the nature and seriousness of the offense charged; (2) the weight of the evidence against the

23  defendant; (3) the defendant's character, physical and mental condition, family and community

24

[1] The Defendant is also facing a California state misdemeanor charge, as explained *infra*.

3

ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985).  A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).  Importantly, a bond will not mitigate the risk of danger.  S. Rep. No. 225, 98th Congress, 1st Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding that "a defendant who is a danger to the community remains dangerous even if he has posted a substantial money bond")."  *See also United States v. Rodriguez*, 950 F.2d 85, 89 (2d Cir. 1991) ("$100,000 security bond, cosigned by two financially responsible persons, strict pretrial service agency supervision and restriction of travel" and the "existence of four cosigners and $10,000 cash may assure the appearance of [defendant] at trial but will not secure the safety of the community"); *United States v. Argaves*, 2009 WL 1859226 at *4 (D. Conn., June 26, 2009) (unpublished) (observing that the Second Circuit "has stated repeatedly that conditions of release that may be sufficient to overcome a risk of flight – including, but not limited to, increased financial obligations, decreased access to liquid assets, surrender of a passport, and further travel restrictions – are often insufficient to reasonably assure the community's safety").

This is because the harm that results from a dangerous act cannot be easily remedied; in contrast, a failure to appear can be corrected by an arrest.  Moreover, a bond does not ensure the

1  safety of the community in the same way as it provides an incentive to appear, because harms

2  may be inflicted that will not result in the forfeiture of the bond.

3      **B.      The Defendant Is a Flight Risk.**

4          1.      The Defendant Has Evaded and/or Frustrated Location Monitoring.

5      On September 18, 2015, in the CDCA fraud case, the Defendant was released on a

6  $500,000 bond with conditions, including location monitoring (*i.e.*, by wearing an ankle

7  bracelet).  The Defendant has attempted to frustrate the location monitoring system as follows:

8      On June 29, 2016, counsel for the Defendant sent one of the Assistant United States

9  Attorneys assigned to the CDCA fraud case an e-mail asking about removing the Defendant's

10 location monitoring bracelet so that he could travel outside the CDCA for "employment related

11 activities."  *See* Exhibit 2.  When asked what those activities would be, defense counsel

12 identified "face to face meetings and negotiations" with "potential franchisees" of Yum To Go,

13 LLC ("YTG"), a business the Defendant and his wife purported to own and operate, as well as

14 "potential restaurants that could use YTG's services."

15     On July 15, 2016, the Government informed the Defendant that it objected to the request

16 because there was "no evidence that YTG has potential out of state franchisees and/or restaurant

17 clients with which defendant must meet" and noted reasons to believe that YTG was not a viable

18 business.  *Id*.  Although the Government opposed the requested removal of the electronic

19 monitoring condition, the Government stated that, "[w]ith respect to travel, the [G]overnment

20 would be willing to consider each request to travel separately on a case by case [basis] if

21 defendant presents specific information regarding each instance of proposed travel (dates,

22 location, purpose including name and contact information for proposed franchisee and/or

23 restaurant client).  If defendant's requests to travel for legitimate, documented business purposes

24 are so frequent that his procedure becomes unwieldy, we can revisit the issue at that time."  *Id*.

5

The Defendant did not respond. Instead, 10 days later, the Defendant filed an unemployment insurance benefits claim based on being "laid off" from YTG. *See* Exhibit 3. These facts support the inference that the initial request to remove the electronic monitoring condition for "employment related activities" was based on false facts presented in an effort to avoid location monitoring. The Defendant then sought a modification of his bond to remove the location monitoring condition. The Court (Magistrate Judge John McDermott) denied the request on September 1, 2016. Shortly thereafter, Pretrial Services learned of tampering with the Defendant's location monitoring device and informed the Court thereof on October 3, 2016. *See* Exhibit 1.

As a result of the tampering, the Defendant was able to evade location monitoring for 14 hours. *Id*. After a new device was fitted, the Defendant did not charge it properly, thereby being able to evade location monitoring for another 10 hours. *Id*. On November 2, 2016, there were further problems with the Defendant's location monitoring device and the Defendant refused to comply with instructions of the Pretrial Services Officer who was attempting to inspect it. *Id*. The Defendant engaged in similar obstructive conduct on November 7, 2016. *Id*. This pattern of conduct undercuts any faith the Court can have in the Defendant's willingness to comply with any potential court-ordered conditions of bond—in particular, the conditions designed to monitor his location and ensure his appearance.

CDCA Pretrial Services has affirmatively stated that the Defendant is an "unsuitable candidate for bail" because of his demonstrated unwillingness to comply with its directives. *Id*. This Court should not revoke Magistrate Judge Kim's detention order and force Pretrial Services here in the District of Nevada to attempt to supervise the Defendant despite clear evidence supporting the conclusion he will not abide by all of the rules of supervision.

2.      The Defendant Has a Strong Incentive to Flee Due to the Sentence He is Facing if Convicted.

The Ninth Circuit has recognized that the greater a defendant's sentencing exposure, the greater his incentive to flee.  *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (affirming order of detention entered after arrest on complaint where, among other factors, defendant faced even graver penalties under the indictment that was subsequently filed and, thus, had "an even greater incentive to consider flight").  Here, if the Defendant is convicted of the charge in the instant indictment, he will face a significant sentence because he has a prior felony conviction for a crime of violence and the firearms at issue are machine guns.  Under the applicable sentencing guidelines ("USSG"), the Defendant's total offense level is anticipated to be 22 pursuant to USSG § 2K2.1(a)(3).  Because the Defendant is in at least Criminal History Category III, he is facing a sentencing guidelines range of at least 51-63 months if convicted at trial, which of course could be ordered to run consecutively to any sentence he faces in the CDCA fraud case.

**C.      The Defendant Presents a Danger to the Community.**

The Defendant has a lengthy criminal history involving threats and assaultive and violent behavior.  The instant charge reflects dangerousness not only because it involves a weapon but also because it involves flouting court directives – not to possess a firearm – put in place following each of his prior felony convictions.  The Defendant's prior criminal history as a whole, which dates back to 1997 and includes at least five felony convictions, is troubling to say the least and evinces a pattern of conduct that establishes he poses a danger to the community at large and is prone to reoffend:

a.      12/1/1997 – Enter Non-Commercial Dwelling – 18 months' probation

7

b.    4/29/1998 – Fight Noise Offensive Words – 18 months' probation

c.    2/24/2000 – Prevent/Dissuade Witness – Probation revoked with 8 months' imprisonment

d.    3/2/2001 – Grand Theft – 3 years' probation

e.    11/3/2002 – Failure to Appear on a Felony – 3 years' probation, 120 days in jail [Attempt Prevent Witness Report dismissed]

f.    10/13/2004 – False Insurance Information for Pay – 60 months' probation, 275 days in jail

g.    10/4/2005 – Threaten Crime to Intent to Terrorize, Inflict Corporal Injury on Spouse – 3 years' imprisonment [Attempt to Prevent Victim Report, Violation of Domestic Violence Order, Dissuade Victim or Witness, and Willful Cruelty to Child dismissed as part of plea deal]

h.    5/17/2006 – Stalking – 36 months' imprisonment [Inflicting Corporal Injury on a Spouse dismissed]

i.    5/17/2006 – Probation Violation – Dissuade Witness and Failure to Appear – 16 months' imprisonment

j.    1/22/10 – Domestic Violence arrest

1.    The Defendant's Threatening Conduct Towards California Employment Development Department ("EDD") Administrative Judge Leah Gasendo on October 10, 2016.

The Defendant's dangerousness is also clear from recent conduct. On October 10, 2016, the Defendant appeared at an administrative hearing conducted by EDD Administrative Judge Leah Gasendo at the Department of Industrial Relations in Oxnard, California. The Defendant's conduct at the hearing was so threatening to Judge Gasendo that she called the California

8

Highway Patrol ("CHP") in order to have CHP Officers present at the hearing.  *See* Exhibit 4.
Judge Gasendo stated that she felt physically threatened by the Defendant, who was sitting
approximately 10 feet from her, fidgeting, and on the edge of his chair as if he was going to
"spring forward."  At one point, the Defendant was standing while using foul language towards
Judge Gasendo.  *See* Exhibit 5.  At the end of the work day, Judge Gasendo requested two of her
fellow judges to escort her to her vehicle because she was afraid that the Defendant and his
brother would attack her.  *Id.*

The actual recording of the hearing (attached as Exhibit H to the Defendant's Motion)
shows that Judge Gasendo's fears were well-founded.   On the recording, the Defendant can be
heard shouting at Judge Gasendo.  When Judge Gasendo instructed the Defendant's brother to
control the Defendant (who the brother had called as a witness at the hearing), the Defendant
shouted, "Nobody controls me.  Nobody controls me."  At another point in the hearing, the
Defendant berated the judge: "You need to know what you are doing 'cause I'm at a new level.
When you talk to me, you gotta be sharp."  When Judge Gasendo stated that she did not feel
comfortable with the Defendant's behavior, he challenged her, saying in a belligerent tone of
voice: "What behavior? You're just going to make stuff up.  I don't have to answer your
questions."

He later told another Judge (Mark Maerowitz) who came in before the CHP arrived that
he (Judge Maerowitz) was "full of shit."  This behavior makes it clear that the Defendant has
absolutely no respect for authority; it is also further evidence supporting the conclusion that the
Defendant will not abide by any conditions of release if granted.  Incidentally, the Defendant
claims that some of the CDCA fraud charges relate to the unemployment dispute raised by his
brother at the EDD hearing.  Defendant's Motion, at 4.  This is false.  The Defendant's brother's
EDD appeal hearing had nothing to do with any of the fraudulent EDD claims identified in the

9

1   CDCA fraud indictment, which was filed in September 2015.   Rather, it related to an

2   unemployment insurance claim that Herrera submitted on February 4, 2016, after he was

3   allegedly laid off by YTG.  *See* Exhibit 6.

4        The Defendant also focuses on one paragraph at the very end of Department of Labor,

5   Office of Inspector General Special Agent Cory Oravecz's summary of the interview of Judge

6   Gasendo concerning the Defendant's name change (attached as Exhibit 5).  Defendant's Motion,

7   at 5.  This entire argument is irrelevant, however, because at no point during the detention

8   hearing in front of Magistrate Judge Kim did the Government rely on the statement regarding the

9   Defendant's name change.  And, contrary to the Defendant's contention, this information was

10  not included in the Pretrial Services report.  Rather, this issue was raised by the Defendant in an

11  attempt to attack the accuracy of the entire report summarizing Judge Gasendo's interview;

12  furthermore, this one paragraph at the end of the interview summary does not call into question

13  the credibility of Judge Gasendo, who was merely relaying to SA Oravecz information that

14  someone else provided her, or the accuracy of the SA Oravecz's report itself.

15        2.   The Defendant's Threatening Conduct Towards Ventura Harbor
             (California) Patrol Officers and Others in August 2015.

16

17        Ventura Harbor Patrol Officers testified under oath about threats made, and threatening

18  conduct undertaken by, the Defendant in August 2015.[2]  The threats were so significant that the

19  Harbormaster hired an armed guard to be present in the Harbor Patrol Office for a week.

20  Additionally, the General Manager of the Ventura Harbor Village stated that the Defendant was

21  enraged by certain citations issued to his (the Defendant's) brother; when the General Manager

22  subsequently spoke to the Defendant, the Defendant said he was going to "come to [the General

23

24  [2] The testimony was presented at an evidentiary hearing on March 21, 2016, on a motion to modify bond brought by the Defendant's brother, James Manuel Herrera, who is a codefendant in the CDCA fraud case.  Following the testimony, Magistrate Judge McDermott denied the motion to modify the bond.

Manager's] office and show everyone what a badass [he] is."  The Defendant also threatened the General Manager and his staff, telling the General Manager that "You're f—king pussies."  The General Manager asked the Defendant if he was threatening him, and the Defendant responded, "Yes I am, you son of a bitch."  *See* Exhibit 7.

This conduct resulted in the imposition of a restraining order (Workplace Violence Prevention) against the Defendant with respect to no less than nine individuals.  The restraining order was entered by the Superior Court of California, County of Ventura, in *Ventura Port District dba Ventura Harbor Village v. Jack Benjamin Hessiani*, Case No. 56-2015-00470864-CY-PT-VTA, on August 13, 2015, and reissued on September 1, 2015; September 21, 2015; October 21, 2015; and recently through January 13, 2016.  *See* Exhibit 8.  The Defendant's conduct towards the General Manager ultimately resulted in a misdemeanor criminal charge being filed against the Defendant in April 2016; he is facing a January 25, 2017 jury trial in that matter.  *See* Exhibits 9 and 10.

3.   The Defendant's Threatening Conduct Towards Business Owners and Patrons of Ventura Harbor and Channel Islands Harbor (California).

Owners of businesses at Ventura Harbor and Channel Islands Harbor have testified under oath about threats made, and threatening conduct undertaken by, the Defendant in the late Summer and Fall of 2015.[3]   The conduct included physical intimidation, defamation with false reviews on social media, and an attempt to extort money from an alleged "competitor" with the Defendant's business.  The conduct was sufficiently serious that one of the businessmen felt the need to install additional security measures at his business.

.   .   .

.   .   .

---

[3] This testimony was also presented at the hearing on March 21, 2016 referenced in note 2, *supra*.

4.      The Defendant Has Engaged in a Pattern of Threatening Lawsuits to Intimidate People – Including Potential Witnesses.

After an agent for the Defendant's landlord provided documents to the Government, the Defendant sent text messages to the agent which included a threat that the Defendant would sue the agent for "violation of privacy.  I have rights and I'm going to exercise those rights when people violate my rights."  *See* Exhibit 11.  In an apparent effort to further frighten the agent and deter his cooperation with the Government, the Defendant wrote, "Also I record myself when I talk to anybody so if you're going to say something different I would advise that you think about what you say if it's a lie you will be caught in it."  *Id.*

Further, as part of his harassment and intimidation of the Ventura Harbor Patrol Officers in August 2015, the Defendant actually filed a series of bogus lawsuits.  In addition, he claimed to have filed a complaint with the State Bar against his former attorney and threatened to file a lawsuit against his brother James Herrera's lawyer.[4]   The Defendant even threatened to "bring a lawsuit against" Pretrial Service Officers who he claimed were trying to "violate his civil rights." *See* Exhibit 1.  This obstructive and intimidating conduct is particularly relevant here, because in order to prove the instant case at trial, the Government intends on relying upon the testimony of lay witnesses who have come into contact with the Defendant.

The instant offense arose out of a trip the Defendant took to a shooting range here in Las Vegas on February 6, 2015 whereupon the Defendant possessed and fired fully-automatic machine guns (in full view of other customers and employees of the business) and preserved it via photographs he posted on social media.[5]  The Defendant also signed a form at the gun range

---

[4] The Defendant's statements about these lawsuits were described in the declarations of counsel in their respective Motions to Withdraw.
[5] The Defendant's Motion asserts that "… these photos appear to be internet posted photographs and chats of unknown origin, which have no evidentiary value without any proof of authenticity."  Defendant's Motion, at 12.  The assertion is misleading, however, since it has long been established that the contents of a photograph itself can

falsely stating he was allowed to possess a firearm; this document has been produced to the Defendant in discovery already. *See* Exhibit 12. It is also indisputable that the Defendant was a convicted felon on February 6, 2015 and that all of the machine guns in the inventory of the gun range were manufactured outside of the State of Nevada and therefore necessarily travelled in and affected interstate commerce. Consequently, the proof is evident in this case, and the presumption that the Defendant will be convicted if he goes to trial is great.

The nature of the offense, along with the weight of the evidence, are factors that this Court may consider. The Ninth Circuit has consistently held, however, that of the four factors, the weight of the evidence against the defendant is the least important. *See United States v. Gebro*, 948 F.2d, 1118, 1121 (9th Cir. 1991); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Nevertheless, 18 U.S.C. § 3142(g) *requires* this Court to consider the nature of the offense and evidence of guilt; these factors may be considered in terms of the likelihood that the Defendant will pose a danger to the community if released. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985); *cf. United States v. Winsor*, 785 F.2d 755, 757 ("[e]vidence of guilt is relevant only in terms of the likelihood that the person will fail to appear or will pose a danger to the community").

The Court should also take into account the fact that here, the Defendant specifically acquired and possessed firearms despite his knowledge that he could not legally possess one. This conscious disobeying of the law (and lying on the gun range form in order to accomplish that specific objective) makes it more likely that the Defendant will fail to abide by release conditions.

.   .   .

---

authenticate it. *See, e.g.*, *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) ("Even if direct testimony as to foundation matters [of a photograph] is absent, … the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence.").

**D.     The Defendant is not Entitled to Another Detention Hearing Pursuant to 18 U.S.C. § 3142(g).**

The detention order issued by Magistrate Judge Kim reflects the findings that the Court made orally at the hearing.  The detention hearing lasted approximately 35 minutes.  The Court explicitly stated what it was relying upon, made specific findings, and explicitly said it had considered all the 3142(g) factors.  Further, the fact that the detention order itself is "unsigned" is without significance given the presumption of regularity for official functions and the fact that the detention order was filed on the court docket.  "'In the absence of clear evidence to the contrary, courts presume that public officers properly discharge their official duties.'"  *Kohli v. Gonzales*, 473 F.3 1061, 1068 (9th Cir. 2007) (rejecting challenge to Immigration Court's order denying application for asylum where signature on order and title of issuing officer on notice to appear were illegible) (quoting *County of Del Norte v. United States*, 732 F.2d 1462, 1468 (9th Cir. 1984)).  In any event, the transcript of the hearing (attached as Exhibit A to the Defendant's Motion) establishes that Magistrate Judge Kim properly discharged his duties by holding the required hearing.

Federal Rule of Criminal Procedure 5(c)(2) explicitly provides that "[i]f the defendant was arrested in a district other than where the offense was allegedly committed, the initial appearance must be: (A) in the district of arrest; or [alternative not relevant here]."  Rule 5(d)(3) provides that at the initial appearance, "[t]he judge must detain or release the defendant as provided by statute or these rules."  18 U.S.C. § 3142(a) provides that "[u]pon appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial the person be [released or detained under subsection (e)]."  18 U.S.C. § 3145(b) provides that "[i]f a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate

14

1    court, the person may file, with the court having original jurisdiction over the offense, a motion

2    for revocation or amendment of the order."

3         In short, the rules and statutes clearly provide for district judge *review* of a detention

4    order entered by the magistrate judge in the transferring district; they do not provide for a "new"

5    detention hearing in front of the magistrate judge in the district where the offense was committed

6    after the magistrate judge in the transferring district has already held one on the merits.[6]

7    **E.    The Magistrate Judge Properly Considered All of the Evidence Before Him.**

8         As to the argument that the detention order was largely based on facts previously alleged

9    to Magistrate Judge McDermott (who nevertheless initially granted the Defendant release in the

10   CDCA case), the Government readily acknowledged during the detention proceedings before

11   Magistrate Judge Kim that the Defendant had been granted a bond in the CDCA case and had

12   been on bond for over a year.  The Government also acknowledged that the facts underlying the

13   instant indictment were known at the time bond was granted in the CDCA case, and it did not

14   argue that the instant indictment constituted a new violation. At the detention hearing, the

15   Government pointed to *new* information that had come to light since the hearings in front of

16   Magistrate Judge McDermott, namely the Defendant's lack of compliance with Pretrial Services

17   and his threatening conduct before Judge Gasendo at the EDD hearing.  In fact, Magistrate Judge

18   Kim explicitly noted about 22 minutes into the hearing when defense counsel argued that

19

20   [6] The Defendant's Motion asserts that he was never advised that by having a detention hearing in the CDCA, he was
21   waiving his right to have a detention hearing in the District of Nevada.  Defendant's Motion, at 7.  The "right" to
     have a detention hearing in the district the offense was committed in is not a right the Defendant would need to
     waive or of which he would need to be specifically advised.  Pursuant to Rule 5 and 18 U.S.C. § 3142, the
22   Defendant had a right to a detention hearing in connection with his initial appearance after his arrest.  This was
     exactly what he was provided.  While the Defendant could have chosen to waive his right to a detention hearing in
     the CDCA so that detention could instead be addressed here in Nevada, this is not what he chose to do.  In any
23   event, the undersigned has it upon information and belief that an advisement regarding postponing the detention
     hearing until arrival in the charging district was included in the general advisements provided to all defendants at the
     beginning of the calendar, and the Defendant was present for these advisements, which appropriately addressed his
24   right to a detention hearing.  The undersigned can order the recording of this portion of the hearing if the Court so
     desires.

everything was known to Magistrate Judge McDermott when he granted bond in the CDCA case, "But there's new information as well."

Additionally, Magistrate Judge Kim was not reviewing the prior detention proceedings. Rather, he was determining whether detention was appropriate in the instant case *based on all of the evidence before him*. He was required to make his own determination regarding detention—independent of any previous determinations made by Magistrate Judge McDermott—and he did so. Assuming *arguendo* that Magistrate Judge Kim was to consider the prior detention proceedings, detention was certainly appropriate here in light of the new evidence. Notably, Magistrate Judge McDermott, by requiring a $500,000 bond and location monitoring, clearly believed that the Defendant posed a very serious risk of non-appearance and danger to the community.

The new criminal charge and additional evidence regarding risk of non-appearance and danger, including non-compliance with Pretrial Services in the CDCA case and the Defendant's recent conduct at the EDD hearing, were more than enough to establish that detention was now appropriate in the instant case.

**F.    The Defendant's Argument that He Can Return to Work is Unavailing and Dubious.**

The Defendant claims that he will be able to return to work at YTG if released on bond. Defendant's Motion, at 6. But the Defendant has misrepresented the facts surrounding this company. As noted above, on July 25, 2016, the Defendant applied for unemployment benefits by claiming that he had been laid off from YTG. *See* Exhibit 3. Specifically, the Defendant claimed that there was "[n]ot enough money coming in to support [his] employment." *Id.* The Defendant also stated that he did not "expect to return to work" at YTG. *Id.* As of October 19, 2016, YTG reported (in a quarterly report) to the California EDD that it had zero employees (and

had never reported having more than two employees dating back to October 2015). *See* Exhibit 13. This stands in stark contrast to the Defendant's current claim in his Motion that YTG has eight to 12 employees. What's more, on October 28, 2016, the Defendant appeared at an EDD appeal hearing in which he reiterated that he had been laid off from YTG because there was not enough work.

Simply put, the fact that the Defendant is presently seeking unemployment insurance benefits because he was laid off from YTG—which is owned by his wife and purportedly operates out of his residence—raises serious concerns regarding the credibility of the Defendant's representations to this Court (and the legitimacy of his EDD claim), and further establishes that the Defendant is a danger to the community and poses a risk of nonappearance.

**G.    The CDCA Fraud Case.**

The Defendant repeatedly tries to minimize the fraud charges he and his brother are facing in the CDCA. These charges, however, are incredibly serious. Below is a brief summary of the charges and evidence against the Defendant. The Defendant also suggests that the fraud charges at issue in the CDCA case have somehow already been adjudicated by the EDD proceedings pertaining to his brother's most recent unemployment insurance benefits claim, which was filed in February 2016 after his brother was allegedly laid off from YTG. Defendant's Motion, at 4 and 5. However, as the summary of the CDCA charges and evidence makes clear, the EDD proceedings did not address any of the fraud charges at issue in the CDCA case or diminish in any way the strength of the Government's evidence of the charged fraud.

1.    Summary of the Fraud Scheme Charged in the California Indictment.

On September 15, 2015, a federal grand jury in the CDCA returned a 22-count indictment charging the Defendant, together with co-defendants James Manuel Herrera, Daniel Ayala-Mora, and Eduardo Josue Garcia, with operating a scheme to (1) submit false wage information for

17

individuals whom they falsely claimed worked for fictitious companies, and then (2) fraudulently apply for and obtain unemployment insurance ("UI") benefits in the names of these individuals. The Defendant is charged with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349; 12 counts of mail fraud, in violation of 18 U.S.C. § 1341; and three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  The co-defendants are also charged with using unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2), and additional counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

To date, the Government has identified more than 40 fictitious companies connected to the Defendant's scheme.  The California EDD identified these companies by doing searches of its electronic claims database using a specialized data management system.  These searches identified claims that were connected to the Defendant's fictitious employer scheme in multiple ways including that:

- they were submitted by using the same IP address as claims that are part of the scheme;

- they were submitted on similar dates and times as claims that are part of the scheme;

- they named the same "employer" companies as are named on claims that are as part of the scheme;

- the address for the claimant or for the employer is the same P.O. Box that was used on claims that are part of the scheme;

- the "owner" of the employer-business is the same as the "owner" of other businesses used in the scheme or is the named claimant on other claims that are part of the scheme;

- the named claimant had submitted multiple UI claims based on different employers including employers used on claims that are part of the scheme; and

- telephone numbers used on the claims were the same as or similar to telephone numbers used on claims that are part of the scheme.

The Government also investigated many of the employer-businesses named in the claims and determined that they did not exist at the physical locations provided as their addresses and/or the individuals identified as their incorporators, officers and/or employees were not employed by or associated with the businesses. The Government has also interviewed many of the named claimants. One of these claimants, "J.T.," stated that, when he was 18, he met the Defendant through his uncle. (Four UI claims were filed in the uncle's name based on wages purportedly earned at four of the fictitious businesses connected to the scheme.) The Defendant offered him $50 to open a post office box. On two occasions, the Defendant took J.T. to a UPS store, paid for the post office box, and kept the key. The Defendant told J.T. he could "hook him up" with some money.

The Defendant said he would put J.T. on a company he (the Defendant) made up and then fire J.T. so that J.T. could get UI benefits. J.T. gave the Defendant his identifying information and then, after a while, the Defendant called J.T. and told J.T. to meet him in the parking lot at a Post Office in Oxnard, California. The Defendant then gave J.T. some cash. Thereafter, every two weeks or so, the Defendant would call to set up a meeting at which he would give J.T. between $200 and $450 in cash. The Defendant asked J.T. if he knew other people who would be interested in getting this kind of money. J.T. referred four people to the Defendant, who ultimately gave J.T. extra cash when another person signed on.

J.T. admitted that he knew what he was doing was wrong. He said, "I thought it was cool, I was getting $200 for doing nothing." To date, the Government has identified UI benefits

19

1    claims submitted on behalf of approximately 384 claimants beginning in 2012 that are connected

2    to the Defendant's scheme.   Approximately $6.7 million was fraudulently claimed, and

3    approximately $4.8 million was actually paid out on these claims.

4        **H.    Additional Factual Inaccuracies.**

5        The Defendant's Motion asserts that, with regards to the "Venture Harbor dispute," all of

6    the "Port issues" have been "resolved in a settlement agreement."   Defendant's Motion, at 3.

7    The "Port issues" are not "resolved," however; as noted above, the Defendant has been

8    criminally charged with violating California Penal Code 653m(b) based on the harassing calls he

9    made to the Ventura Harbor Patrol office, and the case is still pending trial.[7]   The Defendant's

10   assertion that the detention hearing was "in chambers" (Defendant's Motion, at 2) is also

11   incorrect; rather, the detention hearing was conducted in open court.   Lastly, contrary to the

12   Defendant's suggestion (Defendant's Motion, at 11), the Government did not argue to Magistrate

13   Judge Kim that the Defendant's possession of a firearm (as charged in the instant indictment)

14   constituted a violation of his pre-trial release in the CDCA case.

15                                   **CONCLUSION**

16       Magistrate Judge Kim previously found that the Defendant posed a danger to the

17   community and a risk of nonappearance, and that there were no conditions or a combination of

18   conditions that would reasonably assure the safety of any other person and the community and

19   the Defendant's appearance as required.   Based on the facts and circumstances of this case, along

20   with the Defendant's prior criminal history, the Magistrate Judge's detention order should not be

21   revoked after a *de novo* review.   Nor is the Defendant entitled to a new detention hearing in the

22   .   .   .

23   _____

24   [7] California Penal Code 653(m)(b) provides in pertinent part: "Every person who, with intent to annoy or harass, makes repeated telephone calls or makes repeated contact by means of an electronic communication device, or makes any combination of calls or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor."

1    District of Nevada.  The Defendant's Motion should therefore be denied.

2             Dated this, the 3rd day of January, 2017.

3                                              Respectfully Submitted,

4                                              DANIEL G. BOGDEN
                                               United States Attorney
5
                                               By: /s/ Phillip N. Smith, Jr.
6                                                  PHILLIP N. SMITH, JR.
                                                   Assistant United States Attorney
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## <u>CERTIFICATE OF SERVICE</u>

2

      I, Phillip N. Smith, Jr., certify that the following individual was served with a copy of the

3

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO REVOKE ORDER OF

4

DETENTION AND GRANT RELEASE on this date by the below-identified method of service:

5

Electronic Case Filing
Kathleen Bliss, Esq.

6

Counsel for Defendant JACK BENJAMIN HESSIANI

7

DATED:      January 3, 2017.

8

9

                            //s//
                         PHILLIP N. SMITH, JR.
                         Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24